FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Oct 29, 2026

SEAN F. MCAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| KRISTINA R.,<br><br>Plaintiff,<br><br>v.<br><br>FRANK BISIGNANO, Commissioner of Social Security,<br><br>Defendant. | NO. 2:26-CV-0065-TOR<br><br>ORDER GRANTING PLAINTIFF'S OPENING BRIEF; DENYING DEFENDANT'S RESPONSE BRIEF |

BEFORE THE COURT are Plaintiff's Opening Brief (ECF No. 9) and Defendant's Response Motion (ECF No. 11). These matters were submitted for consideration without oral argument. The Court has reviewed the record and files herein and is fully informed. For the reasons discussed below, Plaintiff's motion (ECF No. 9) is **GRANTED** and Defendant's motion (ECF No. 11) is **DENIED**.

## JURISDICTION

The Court has jurisdiction over this case pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

## STANDARD OF REVIEW

A district court's review of a final decision of the Commissioner of Social Security is governed by 42 U.S.C. § 405(g). The scope of review under § 405(g) is limited: the Commissioner's decision will be disturbed "only if it is not supported by substantial evidence or is based on legal error." *Hill v. Astrue*, 698 F.3d 1153, 1158–59 (9th Cir. 2012) (citing 42 U.S.C. § 405(g)). "Substantial evidence" means relevant evidence that "a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1159 (quotation and citation omitted). Stated differently, substantial evidence equates to "more than a mere scintilla but less than a preponderance." *Id.* (quotation and citation omitted). In determining whether this standard has been satisfied, a reviewing court must consider the entire record as a whole rather than searching for supporting evidence in isolation. *Id.*

In reviewing a denial of benefits, a district court may not substitute its judgment for that of the Commissioner. *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). If the evidence in the record "is susceptible to more than one rational interpretation, [the court] must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012). Further, a district court "may not reverse an ALJ's decision on account of an error that is harmless." *Id.* An error is harmless "where it is inconsequential to the [ALJ's] ultimate nondisability determination." *Id.* at 1115

(quotation and citation omitted). The party appealing the ALJ's decision generally bears the burden of establishing that it was harmed. *Shinseki v. Sanders*, 556 U.S. 396, 409–10 (2009).

## FIVE-STEP SEQUENTIAL EVALUATION PROCESS

A claimant must satisfy two conditions to be considered "disabled" within the meaning of the Social Security Act. First, the claimant must be "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Second, the claimant's impairment must be "of such severity that [he or she] is not only unable to do [his or her] previous work[,] but cannot, considering [his or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner has established a five-step sequential analysis to determine whether a claimant satisfies the above criteria. *See* 20 C.F.R. §§ 404.1520(a)(4)(i)(v), 416.920(a)(4)(i)–(v). At step one, if the claimant is engaged in "substantial gainful activity," the Commissioner must find that the claimant is not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not engaged in substantial gainful activities, the analysis proceeds to step two.

At step two, the Commissioner considers the severity of the claimant's impairment. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the claimant suffers from "any impairment or combination of impairments which significantly limits [his or her] physical or mental ability to do basic work activities," the analysis proceeds to step three. 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant's impairment does not satisfy this severity threshold, however, the Commissioner must find that the claimant is not disabled. *Id.*

At step three, the Commissioner compares the claimant's impairment to several impairments recognized by the Commissioner to be so severe as to preclude a person from engaging in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the impairment is as severe or more severe than one of the enumerated impairments, the Commissioner must find the claimant disabled and award benefits. 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the severity of the claimant's impairment does meet or exceed the severity of the enumerated impairments, the Commissioner must pause to assess the claimant's "residual functional capacity." Residual functional capacity ("RFC"), defined generally as the claimant's ability to perform physical and mental work activities on a sustained basis despite his or her limitations (20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1)), is relevant to both the fourth and fifth steps of the analysis.

At step four, the Commissioner considers whether, in view of the claimant's RFC, the claimant is capable of performing work that he or she has performed in the past ("past relevant work"). 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant is capable of performing past relevant work, the Commissioner must find that the claimant is not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f). If the claimant is incapable of performing such work, the analysis proceeds to step five.

At step five, the Commissioner considers whether, in view of the claimant's RFC, the claimant is capable of performing other work in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). In making this determination, the Commissioner must also consider vocational factors such as the claimant's age, education, and work experience. *Id.* If the claimant is capable of adjusting to other work, the Commissioner must find that the claimant is not disabled. 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1). If the claimant is not capable of adjusting to other work, the analysis concludes with a finding that the claimant is disabled and is therefore entitled to benefits. *Id.*

The claimant bears the burden of proof at steps one through four above. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). If the analysis proceeds to step five, the burden shifts to the Commissioner to establish that (1) the claimant is capable of performing other work; and (2) such work "exists in significant numbers

in the national economy." 20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2); *Beltran v. Astrue*, 700 F.3d 386, 389 (9th Cir. 2012).

**ALJ'S FINDINGS**

On May 11, 2021, Plaintiff protectively filed concurrent applications for disability insurance benefits under Title II of the Social Security Act and supplemental security income benefits under Title XVI of the Social Security Act, alleging a disability onset date of January 12, 2021. Tr. 431–460. The application was denied initially (September 29, 2021), and again on reconsideration (April 27, 2022). Tr. 233–38, 248–54. Plaintiff appeared at a video hearing before Administrative Law Judge ("ALJ") Marie Palachuk on May 17, 2023. Tr. 55–81. The ALJ issued an Unfavorable Decision on June 22, 2023. Tr. 187–217.

Following a remand by the Appeals Council, a supplemental video hearing was held before ALJ Palachuk on February 5, 2025. Tr. 82–106, 218–223. The ALJ issued another Unfavorable Decision on February 28, 2025. Tr. 14–47.

On April 10, 2025, Plaintiff filed a request for review with the Appeals Council. Tr. 425–427. On December 19, 2025, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision subject to judicial review. Tr. 1–6; 20 C.F.R. §§ 404.981, 416.1481. Plaintiff filed a timely appeal to this Court.

At step one of the sequential evaluation analysis, the ALJ found Plaintiff had not engaged in substantial gainful since January 12, 2021, the alleged onset date. Tr. 19. At step two, the ALJ found Plaintiff had the following severe impairments: degenerative joint disease; inflammatory polyarthritis; degenerative disc disease; postural orthostatic tachycardia syndrome ("POTS"); migraines/headaches; and obesity. *Id.* At step three, the ALJ found Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. Tr. 23. The ALJ then found Plaintiff had a residual functional capacity to perform light work with the following limitations:

> The claimant can stand/walk for four hours per day, so [s]he needs the ability to sit/stand at will. The claimant can use foot pedals with the right lower extremity occasionally. The claimant can perform postural activities occasionally but never climb ladders, ropes or scaffolds, kneel, crouch and crawl. The claimant should avoid concentrated exposure to extreme temperatures, wetness, humidity, industrial noise, and industrial vibration. The claimant should avoid all exposure to hazards such as unprotected heights and dangerous moving machinery. The claimant should avoid all exposure to very bright lights (defined as brighter than standard office fluorescent lighting).

Tr. 24–25.

At step four, the ALJ found Plaintiff has no past relevant work. Tr. 36. At step five, the ALJ found that, considering Plaintiff's age, education, work experience, and residual functional capacity, and testimony from a vocational expert, there were other jobs that existed in significant numbers in the national economy

that Plaintiff could perform, such as routing clerk, office helper, and small products assembler. Tr. 37–38. The ALJ concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, from January 12, 2021, through the date of the decision. Tr. 38.

**ISSUES**

Plaintiff seeks judicial review of the ALJ's final decision denying her disability insurance benefits under Title II of the Social Security Act and supplemental security income benefits under Title XVI of the Social Security Act. Plaintiff raises the following issues:

1. Whether the ALJ properly considered Plaintiff's subjective symptom testimony; and
2. Whether the ALJ properly weighed the medical opinion evidence.

ECF No. 9 at 2, 4–16.

**DISCUSSION**

**A. Plaintiff's Symptom Testimony**

Plaintiff contends the ALJ erred in rejecting her subjective symptom testimony. ECF No. 9 at 2, 4–12. An ALJ engages in a two-step analysis to determine whether a claimant's subjective symptom testimony can be reasonably accepted as consistent with the objective medical and other evidence in the claimant's record. Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2.

"First, the ALJ must determine whether there is 'objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" *Molina*, 674 F.3d at 1112 (quoting *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009)). "The claimant is not required to show that her impairment 'could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom.'" *Vasquez*, 572 F.3d at 591 (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007)).

Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if [the ALJ] gives 'specific, clear and convincing reasons' for the rejection." *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (citations omitted). General findings are insufficient; rather, the ALJ must identify what symptom claims are being discounted and what evidence undermines these claims. *Id.* (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)); *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (requiring the ALJ to sufficiently explain why he or she discounted claimant's symptom claims). "The clear and convincing [evidence] standard is the most demanding required in Social Security cases." *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

The ALJ is instructed to "consider all of the evidence in an individual's record," "to determine how symptoms limit ability to perform work-related activities." SSR 16-3p, 2016 WL 1119029, at *2. When evaluating the intensity, persistence, and limiting effects of a claimant's symptoms, the following factors should be considered: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms. *Id.* at *7–8; 20 C.F.R. §§ 404.1529(c), 416.929(c)(3).

Here, the ALJ found that Plaintiff's impairments could reasonably be expected to cause the alleged symptoms; however, Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record. Tr. 27.

**1. Objective Medical Evidence**

The ALJ concluded that the objective medical evidence as a whole did not support the alleged severity of Plaintiff's impairments. Tr. 27. An ALJ may not

discredit a claimant's symptom testimony and deny benefits solely because the degree of the symptoms alleged is not supported by objective medical evidence. *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *Bunnell v. Sullivan*, 947 F.2d 341, 346–47 (9th Cir. 1991); *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989). However, the objective medical evidence is a relevant factor, along with the medical source's information about the claimant's pain or other symptoms, in determining the severity of a claimant's symptoms and their disabling effects. *Rollins*, 261 F.3d at 857; 20 C.F.R. §§ 404.1529(c), 416.929(c)(2).

The ALJ noted that the medical records revealed Plaintiff sought treatment for various bodily pains and fatigue, and that her most significant bodily pains within the period at issue, other than with respect to her head and chest, related to her back, hips, and knees. Tr. 27. The ALJ determined that the cause of Plaintiff's pains and fatigue appeared to be multifactorial, and they included musculoskeletal conditions as well as potential autoimmune conditions. *Id.* However, the ALJ noted that despite Plaintiff's bodily pains, she was not objectively demonstrated to be substantially physically limited, though she did have some deficits. Tr. 28. Specifically, the ALJ stated that looking at Plaintiff's available physical examination findings overall, although she exhibited tenderness at times, especially in her back, SI joints, and right hip, her gait was largely objectively intact and she was not observed to be using a hand-held assistive device on any significant ongoing basis. *Id.* The ALJ noted that

although Plaintiff alleged she spent most of her time lying down, she did not have any significant signs of atrophy during any of her examinations to suggest long term non-use of a muscle and her muscle strength was generally objectively intact in the extremities. *Id.* The ALJ determined that Plaintiff appeared to get good pain relief in relation to her back and hips through her injections, and her sensation was largely intact. *Id.*; *see, e.g.*, Tr. 721–722, 906, 1404, 1549–1555, 1720–1723, 1782–1811, 2087–2093, 2135–2137, 2494, 2543.

The ALJ determined that while diagnostic testing revealed some musculoskeletal abnormalities, none of these abnormalities were substantial, aside from perhaps with respect to Plaintiff's right hip labrum tear. Tr. 28–29; *see, e.g.*, Tr. 2024 (May 2015: cervical spine MRI showed no acute abnormalities, minimal disco osteophytic bulging at C5-6, and widely patent central canal and neural foramina); Tr. 2024 (February 2016: right hand and right foot x-rays showed minimal changes with respect to osteoarthritis); Tr. 2024 (January 2019: right knee MRI was normal, except for edema); Tr. 1705, 2024 (February 2022: bilateral knee x-rays were negative for any significant abnormalities); Tr. 2024, 2091 (February 9, 2022: pelvis and bilateral hip x-rays showed mild CAM type morphology of the right femoral head and neck anteriorly, which can be seen with femoroacetabular impingement, otherwise, the imaging was negative); Tr. 1663 (August 15, 2022: right hip MRI revealed a full-thickness tear of the anterior superior right labrum;

decreased offset at the femoral head and neck junctions, which can be seen in the setting of cam-type femoral acetabular impingement; mild bilateral gluteus minimus and medius tendinopathy; mild narrowing at the ischiofemoral spaces with subtle edema in the right quadratus femoris muscle, which can be seen in the setting of ischiofemoral impingement; and mild degenerative changes lower lumbar spine); Tr. 1722 (September 20, 2022: lumbar spine x-rays demonstrated mild S-shaped curvature; disc heights that were fairly well-preserved, though the lower-level penetrance was suboptimal; and questionable lower-level facet arthropathy); Tr. 1722 (October 2, 2022: lumbar spine MRI showed an S-shaped curvature of the lumbar spine; mild disc desiccation with a slight posterior disc bulge and possible annular tear at L4-5 with resultant mild right greater than left neuroforaminal narrowing; and well-preserved facets).

The ALJ noted that on June 22, 2023, Plaintiff underwent right hip arthroscopy labral repair and right hip arthroscopy femoral osteoplasty. Tr. 28; citing Tr. 2436. The ALJ determined that although Plaintiff testified she had to stop physical therapy due to her POTS symptoms, she appeared to have been improving in physical therapy while she was undergoing it. Tr. 28; citing Tr. 2400 (August 28, 2023: it was noted that Plaintiff continued physical therapy and recovery from a labral tear, and had been doing better); Tr. 2494 (February 7, 2024: after the surgery,

Plaintiff was found to have 5/5 strength in the lower extremities, and intact sensation).

The ALJ determined that the medical evidence revealed Plaintiff's most significant condition appeared to be POTS. Tr. 29. The ALJ noted that Plaintiff attributed a great deal of symptoms to her POTS, including dizziness, fatigue, fainting/passing out (i.e., syncope or syncope-like episodes), generalized weakness, cramping, food intolerance, dehydration, shortness of breath, chest pains, blood pressure abnormalities, and/or heartrate abnormalities. *Id.* However, the ALJ found that Plaintiff's treatment notes supported good control over her POTS symptoms. Tr. 30–31, *see, e.g.*, Tr. 1281–1282, 1284 (March 3, 2021: during a cardiology appointment, Plaintiff was noted to basically meet the criteria for POTS; she was recommended to try a medication, Verapamil; she was also given Clonidine for as needed use; she was advised about the value of walking 30 minutes daily to help train the nervous system to act more appropriately; controlling her blood pressure was seen as important, especially due to a brain aneurysm that was shown with imaging performed in February 2021; she was counseled about the importance of weight loss for blood pressure control in the long run; her next appointment was not anticipated until another 6 months; physical examination was relatively normal, aside from tachycardia; she was in no acute distress and had no tremors or edema; she reported that she had lost weight since August 2020, and though not clearly

indicated, the suggestion seemed to be that it was intentional); Tr. 820, 822 (May 26, 2021: during a cardiology examination, it was stated that since the last visit, there had been no interval cardiac events and Plaintiff was stable with her POTS; there was no overt syncope, but Plaintiff was unable to tolerate certain foods which complicated her POTS; she was doing well without any recurrent episodes of chest pain or discomfort, shortness of breath, dyspnea on exertion, orthopnea, increased weight gain, edema, or change in overall functional status; she reported feeling well without additional medical complaints; her physical examination was relatively normal, aside from tachycardia and elevated blood pressure); Tr. 1431–1432 (October 2021: during a cardiology appointment, Plaintiff mentioned that her Verapamil medication provided some relief to her elevated heartrate, but that came with increased fatigue and sleeping (as much as 20 hours a day)); Tr. 1539 (March 2022: during an electrophysiologist appointment, Plaintiff indicated she felt 90% improved after insurance approved Corlanor and she began taking this medication); Tr. 1666–1667, 1670, 1672 (September 2022: during an electrophysiologist appointment, Plaintiff stated that she was managing and doing okay; she was wearing her compression hose frequently but she was not able to wear them at the appointment due to feeling overheated; she was using electrolyte supplements; she was taking Corlanor, and she stated that it was working fairly well to control her tachycardia; she endorsed frequently having extreme fatigue for a couple of days

after doing activities; she mentioned that she was still trying to get disability; her symptoms were noted to be extremely variable, as she sometimes had good days, but often had bad days; her physical examination was relatively normal, with findings of normal blood pressure, normal pulse, no acute distress, normal heart and lung sounds, and alert/oriented; Plaintiff was noted to be doing a great job managing her POTS); Tr. 1752, 1756–1759 (December 2022: during an electrophysiologist appointment, Plaintiff indicated that she was doing fairly well with regard to her POTS; she stated that most of her time had been taken up by dealing with her son's diagnosis of POTS, though she reported that she was able to do some baking for the holiday season; her physical examination was relatively normal; an echocardiogram included in the examination notes showed normal findings, including an ejection fraction of 65%; her healthcare provider reported that she was doing well overall); Tr. 2123; 2125–2126; 2129 (April 2023: Plaintiff was noted to be doing well on Corlanor and Clonidine with respect to her POTS; her physical examination was essentially normal; with regard to an anticipated upcoming right hip surgery, Plaintiff's healthcare provider stated she was a low-risk patient for moderate-risk surgery and may proceed with non-cardiac surgery without additional cardiac investigations or interventions); Tr. 2238; 2242, 2244 (October 22, 2024: Erica Valtinson, PA-C, noted that Plaintiff continued treatment with Corlanor and Clonidine; she noted Plaintiff had done an excellent job over the years since her

diagnosis of managing her fluid intake and attempts at exercise; Plaintiff reported she was doing fairly well; she stated she never knew when she was going to have a bad day and need to sit down or pass out, but overall reported she felt good; Plaintiff reported she had been going to her daughter's softball games and going to the pumpkin patch; examination showed Plaintiff was pleasant and in no apparent distress, with no cardiovascular abnormalities or pulmonary abnormalities, and normal behavior; Ms. Valtinson indicated Plaintiff was doing "fantastic.").

The ALJ also noted that the medical records showed Plaintiff sought treatment related to migraines/headaches, although the exact cause of her migraines/headaches was not clear, and various medical conditions were investigated as potential sources. Tr. 31. The ALJ stated that Plaintiff was often described by healthcare providers as being without status migrainosus, even when she reported more frequent migraines/headaches. *Id.*; citing Tr. 752, 833-835, 849–850; 982–990, 1399; 1722, 1876–1880, 2100-2109, 2215, 2235, 2311, 2313. The ALJ also noted that Plaintiff was largely objectively alert and/or oriented during her examinations, despite her complaints of migraines/headaches, suggesting that they were not as intense as alleged, and/or Plaintiff recovered rather well from them. Tr. 31; citing Tr. 725, 961, 1627, 1764, 2127, 2220.

Plaintiff argues that the ALJ's assertion that treatment notes show she had good control over her POTS symptoms is specious and the objective evidence

confirms the severity of her POTS symptoms and her migraines. ECF No. 9 at 8–10; citing Tr. 822–23, 843, 852, 870–71, 897, 928, 1299, 1328–29, 1427, 1787, 2103, 2269, 2478. She asserts that the Ninth Circuit has condemned picking out favorable notes while ignoring the longitudinal picture. ECF No. 9 at 10, ECF No. 12 at 7; citing *Attmore v. Colvin*, 827 F.3d 872, 877 (9th Cir. 2016).

Defendant responds that Plaintiff described debilitating limitations from POTS, migraines, and other physical conditions, but cardiovascular workups during the relevant period showed largely unremarkable results. ECF No. 11 at 5; citing Tr. 87–92, 820-22, 1285, 1278, 1284, 1670, 1756-59, 2126–27, 2242, 2244. Defendant asserts that the ALJ evaluated the medical evidence and reasonably found that while it supported some of Plaintiff's allegations, it was out of step with the more extreme aspects of her complaints. ECF No. 11 at 6.

The ALJ cited objective medical evidence to contradict Plaintiff's testimony that she was as limited as alleged due to multiple physical impairments, including pain in her head, neck, chest, back, knees, and hips, fainting spells and frequent dizziness, lightheadedness, tiredness, and extreme fatigue, episodes of bodily cramping/convulsions, migraines/headaches, nausea, stomach pains, diarrhea, constipation, blood pooling in her legs, and shakiness, inability to stand/walk for long periods, and painful and numb legs that sometimes would not work at all. Tr 25–27.

The Court finds that the ALJ did not err in her determination that the objective medical evidence does not support Plaintiff's testimony that she was as physically limited as alleged.

**2. Improvement with Treatment**

The ALJ also discounted Plaintiff's testimony as inconsistent with her improvement with treatment. Tr. 29–30. "[E]vidence of medical treatment successfully relieving symptoms can undermine a claim of disability." *Wellington v. Berryhill*, 878 F.3d 867, 876 (9th Cir. 2017) (citing 20 C.F.R. §§ 404.1520a(c)(1), 416.920a(c)(1)).

Specifically, the ALJ noted that Plaintiff attributed a great deal of her symptoms to POTS, including dizziness, fatigue, fainting/passing out, generalized weakness, cramping, food intolerance, dehydration, shortness of breath, chest pains, blood pressure abnormalities, and/or heartrate abnormalities. Tr. 29. However, the ALJ found that despite Plaintiff's subjective complaints, the medical records indicated her cardiac/cardiovascular issues and related symptoms, as well as her symptoms from POTS, improved with treatment. Tr. 29–31, *see, e.g.*, Tr. 1539 (March 2022: during an electrophysiologist appointment, Plaintiff indicated that she felt 90% improved after insurance approved Corlanor and she began taking this medication; Plaintiff stated that she had a much higher level of energy, and did not experience the same debilitating tachycardia as she previously did prior to initiation

of Corlanor); Tr. 1666–1667 (September 2022: during an electrophysiologist appointment, Plaintiff stated that she was managing and doing okay; she was wearing her compression hose frequently, but she was not able to wear them at the appointment due to feeling overheated; she was using electrolyte supplements; she was taking Corlanor, and she stated that it was working fairly well to control her tachycardia; she endorsed frequently having extreme fatigue for a couple of days after doing activities; she mentioned that she was still trying to get disability; her symptoms were noted to be extremely variable, as she sometimes had good days, but often had bad days); Tr. 2123 (April 2023: Plaintiff was noted to be doing well on Corlanor and Clonidine with respect to her POTS); Tr. 2238 (October 2024: Ms. Valtinson noted that Plaintiff continued treatment with Corlanor and Clonidine; she noted Plaintiff had done an excellent job over the years since her diagnosis of managing her fluid intake and attempts at exercise; Plaintiff reported she was doing fairly well; she stated she never knew when she was going to have a bad day and need to sit down or pass out, but overall reported she felt good; Plaintiff reported she had been going to her daughter's softball games and going to the pumpkin patch).

Although the ALJ cites treatment notes to show that Plaintiff's symptoms improved when she began taking Corlanor, the ALJ fails to explain how this undermines Plaintiff's allegations. Plaintiff testified at the 2025 hearing that "Corlanor only manages my heart rate in my POTS[.]" Tr. 90. She testified that

"Corlanor manages the heart rate a lot better[,]" and "it does manage my heart rate when I'm at rest more than at the rest of the time." Tr. 90. However, Plaintiff also testified "the symptoms that it reduces are more of the serious ones" and stated she gets less chest pain, less tightness, less shortness of breath from just resting[.]" Tr. 90. She also testified that "it has less of those need to go to the ER symptoms[,]" but the Corlanor does not manage anything with her "GI situation" or blood pressure. Tr. 90–91.

The ALJ also noted that Plaintiff endorsed an improvement with treatment for her migraines and headaches, especially through Botox injections. Tr. 31; *see, e.g.*, Tr. 752, 833-835, 849–850, 982–990, 1399, 1722, 1876–1880, 2100–2109, 2215, 2235, 2311, 2313. The ALJ stated that during some examinations, Plaintiff reported having a complete resolution of her migraines and a decreased need for breakthrough medications when under the effects of Botox. Tr. 31.

Again, the ALJ fails to explain how this reported improvement with Botox undermines Plaintiff's allegations. Plaintiff testified at the 2025 hearing that before she began Botox injections, it would not be uncommon for her to have multiple migraines in one day where she could not have lights on her face. Tr. 94. She testified that when she "initially started getting [Botox], [it] was super helpful." Tr. 94. She testified that she gets Botox injections every three months and in the last three or four days of that time period she starts getting migraines. Tr. 94–95. She

also testified as to the Botox that "over time, it's definitely worn off, just not enough to stop it yet." Tr. 95. She testified as to her migraines with the Botox treatment, "they definitely are a little bit better." *Id.*

The record supports Plaintiff's testimony that Botox treatment was initially "super helpful" but the effects began to wear off over time. Tr. 94–95; *see, e.g.*, Tr. 748 (October 1, 2019: treatment note indicates Plaintiff reported daily headaches that could last all day); Tr. 1399 (January 11, 2022: Plaintiff reported "complete resolution of migraines" and had a decreased need for breakthrough medication after getting regular Botox injections); Tr. 1720, 1722 (October 20, 2022: Plaintiff reported she was "[s]till getting good relief with the Botox for migraines" and a treatment note indicated "Migraines are still fairly well controlled"); Tr. 2313–2314 (May 2, 2024: treatment notes stated that Plaintiff would continue with Botox injections for migraine prevention; she continued to have at least 50% improvement in the frequency and severity of her migraines with this treatment; overall she continued to feel that she has been 50% improvement in the frequency and severity of her migraines with Botox; she noticed that over time she continues to have wearing off of the treatment sooner; right now she starts to have more headaches about 10 to 14 days prior to her next injection cycle).

The ALJ also determined that Plaintiff appeared to get good pain relief in relation to her back and hips through her injections, and her sensation was largely

intact. Tr. 28; *see, e.g.*, Tr. 721–722, 906, 1404, 1549–1555, 1720–1723, 1782–1811), 2087–2093, 2135–2137, 2494, 2543.

The ALJ's conclusion that Plaintiff's improvement with treatment was inconsistent with her alleged physical symptoms was not substantially supported by evidence from the record.

### 3. Conservative Treatment

The ALJ determined that Plaintiff's pain treatment was relatively conservative in nature during the period under review, mostly consisting of observation, medication (including some injections), physical therapy, and some diagnostic testing. Tr. 28. "[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment." *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) (quoting *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995)).

However, the ALJ does not explain how Plaintiff's treatment for her various symptoms undermined her symptom testimony. Tr. 28. The ALJ did not discuss what more aggressive treatment options were available that Plaintiff failed to pursue. Rather, the record reflects that Plaintiff pursued the treatment options available to her, which included medication, hip injections, and surgery. *See* Tr. 2436 (June 22, 2023: Plaintiff underwent right hip arthroscopy labral repair and right hip arthroscopy femoral osteoplasty); Tr. 28 (The ALJ observed that Plaintiff "appeared

to get good pain relief in relation to her back and hips through her injections"); Tr. 1431–1432 (October 2021: Plaintiff's healthcare provider tried getting Corlanor medication, which was initially denied by insurance); Tr. 1539 (March 2022: during an electrophysiologist appointment, Plaintiff indicated she felt 90% improved after insurance approved Corlanor and she began taking this medication).

The ALJ's conclusion that Plaintiff's relatively conservative pain treatment was inconsistent with her alleged physical symptoms was not substantially supported by evidence from the record.

**4. Daily Activities**

The ALJ also determined that Plaintiff's activities do not fully support her allegations of disability and show that she was more physically capable than alleged. Tr. 27. Specifically, the ALJ observed that Plaintiff played a role in taking care of her children and caring for pets, she was able to sometimes prepare at least simple foods, she did some household chores, such as cleaning, although her family members helped at times, she went shopping in stores and through the computer, she spent a lot of time watching television, at least for some portion of the period at issue, despite her claims of migraines and screen light sensitivity, she spent social time with her family, and she drove a car on a regular basis. *Id.*; citing Tr. 89, 91, 597–606, 633–643.

The ALJ determined that although Plaintiff testified that her mother would often drive her to doctors' appointments, the medical evidence suggested otherwise, with minimal mention of her mother being present at Plaintiff's doctors' appointments, and suggestions that her mother was in poor health but nonetheless worked in a dental office. Tr. 27; citing Tr. 1051, 1303, 1624, 1696.

The ALJ also stated that Plaintiff's post-alleged onset date work duties "seemed to possibly be greater than alleged, with the evidence indicating that [she] worked in the billing department at times[.]" Tr. 27; citing Tr. 1676, 2025. The ALJ stated that even if Plaintiff's post-alleged onset date work duties were always the same as she alleged, that would mean she was able to answer a phone and ask questions of the callers at unknown times within her work schedule, even though she endorsed extreme fatigue and not knowing when her other symptoms would occur or otherwise flare up. Tr. 27; citing Tr. 87.

Substantial evidence does not support discrediting Plaintiff's physical impairment allegations based on her daily activities. The Ninth Circuit has "repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities," such as grocery shopping or driving a car, "does not in any way detract from her credibility as to her overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) (Ms. Vertigan could grocery shop without assistance, walk approximately an hour in the malls, play cards, swim, watch television, and read, but

these activities did not consume a substantial part of her day and so did not detract from her credibility). Also, the Ninth Circuit has recognized that the fact a claimant "could participate in some daily activities does not contradict the evidence of otherwise severe problems that she encountered in her daily life during the relevant period." *Diedrich v. Berryhill*, 874 F.3d 634, 643 (9th Cir. 2017).

The ALJ's analysis ignores the evidence both in Plaintiff's testimony and in the medical record as to the extremely limited nature of her daily activities. The ALJ does not explain how Plaintiff's reports that she was able to sometimes prepare at least simple foods and do some household chores with her family members helping at times, shop in stores and through the computer, or drive a car on a regular basis translate to the ability to perform full-time work. *See Burch v. Barnhart*, 400 F.3d 676, 680–81 (9th Cir. 2005) (holding that an ALJ may give less weight to allegations of disabling pain based on a claimant's ability to spend a substantial part of their day in activities that would translate to a workplace setting).

Treatment notes show that Plaintiff's symptoms fluctuate. *See, e.g.*, Tr. 1666–1667 (September 2022: "Her symptoms are extremely variable. She sometimes had good days but oftentimes has bad days."); Tr. 2238 (October 2024: "She never knows when she has a bad day and needs to sit down or may pass out but overall is feeling good.") Further, Plaintiff testified at her hearing in 2025 that she really has to limit the activities she is doing, she has "to be very calculated" with how she is

spending her time, and she never knows how her body is going to react to anything. Tr. 69, 89.

The ALJ references Plaintiff's role in taking care of her children, but the record is scarce as to her childcare duties or activities. *See Trevizo v. Berryhill*, 871 F.3d 664, 682 (9th Cir. 2017) ("[T]here is almost no information in the record about [the plaintiff]'s childcare activities; the mere fact that she cares for small children does not constitute an adequately specific conflict with her reported limitations.").

Moreover, the ALJ's reference to Plaintiff's testimony that her mother would often drive her to doctors' appointments but the medical evidence suggested otherwise, is irrelevant to her symptom reports. Tr. 27; citing Tr. 1051, 1303, 1624, 1696. Further, there are treatment notes in the record that indicate Plaintiff's mother accompanied her to some appointments. *See* Tr. 854 (April 2021: treatment note from the emergency room mentions that Plaintiff's mother is in the room with her); Tr. 937, 939 (December 2020: "Patient is accompanied by mother").

Finally, the ALJ's determination that Plaintiff's post-alleged onset date work duties "seemed to possibly be greater than alleged, with the evidence indicating that [she] worked in the billing department at times[,]" is not supported by substantial evidence. Tr. 27; citing Tr. 1676 (November 2022: treatment notes under "Patient History" indicate "Patient's occupation: Billing dept. Hours work per week: 2."); Tr. 2025 (January 2023: treatment notes under "Patient History" indicate "Patient's

occupation: Billing dept. Hours work per week: 2."). The ALJ failed to consider that as part of the same treatment notes, the additional background information states that she worked two hours per week. Tr. 1676, 2025. Further, Plaintiff testified at the 2025 hearing that she gets "a couple of calls a week" on her work cell phone at home and each call is usually about 10 minutes, which is consistent with the treatment notes. Tr. 87.

The ALJ's conclusion that Plaintiff's activities of daily living were inconsistent with her alleged physical symptoms was not substantially supported by evidence from the record.

The Court finds that the ALJ's overall credibility finding was not supported by substantial evidence. Given that all other reasons provided by the ALJ for rejecting Plaintiff's allegations have been deemed invalid by this Court, a lack of supporting objective medical evidence may not be the sole factor for rejecting Plaintiff's symptom testimony. Based on the foregoing, the Court finds the ALJ erred by failing to properly assess Plaintiff's subjective complaints.

**B. Medical Opinion Evidence**

Plaintiff argues that the ALJ erred by failing to properly evaluate the medical opinion evidence of Dr. Jerry Seligman, testifying medical expert, Dr. Steven Hansen and PA-C Erika Valtinson, treating sources, and the prior administrative medical findings ("PAMFs"). ECF No. 9 at 12–17.

For claims filed on or after March 27, 2017, new regulations apply that change the framework for how an ALJ must evaluate medical opinion evidence. 20 C.F.R. §§ 404.1520c, 416.920c; *see also Revisions to Rules Regarding the Evaluation of Medical Evidence*, 2017 WL 168819, 82 Fed. Reg. 5844–01 (Jan. 18, 2017).

Under the new regulations, the ALJ will no longer "give any specific evidentiary weight . . . to any medical opinion(s)." *Revisions to Rules*, 2017 WL 168819, 82 Fed. Reg. 5844–01, 5867–68. Instead, an ALJ must consider and evaluate the persuasiveness of all medical opinions or prior administrative medical findings from medical sources. 20 C.F.R. §§ 404.1520c, 416.920c. The factors for evaluating the persuasiveness of medical opinions and prior administrative medical findings include supportability, consistency, relationship with the claimant, specialization, and "other factors that tend to support or contradict a medical opinion or prior administrative medical finding," including but not limited to "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)–(5).

//

//

//

//

The ALJ is required to explain how the most important factors, supportability and consistency, were considered. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). These factors are defined as follows:

> (1) *Supportability.* The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.
>
> (2) *Consistency*. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

20 C.F.R. §§ 404.1520c(c)(1)-(2), 416.920c(c)(1)–(2).

The ALJ may, but is not required to, explain how "the other most persuasive factors in paragraphs (c)(3) through (c)(5)" were considered. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). However, where two or more medical opinions or prior administrative findings "about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same," the ALJ is required to explain how "the most persuasive factors" were considered. 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(2).

*1. Jerry Seligman, MD, Testifying Medical Expert*

Dr. Seligman, a medical expert in internal medicine, testified at Plaintiff's prior administrative hearing on May 17, 2023. Tr. 34, 59–62. Dr. Seligman opined

that Plaintiff had severe physical impairments of degenerative joint disease, inflammatory polyarthritis of multiple joints, osteoarthritis, degenerative disc disease of the lumbar spine, POTS, sinus tachycardia, migraine headaches, and obesity. Tr. 34. Dr. Seligman indicated that he saw references to epilepsy in the medical evidence, but that it could not be considered to be epilepsy. *Id.* He determined that Plaintiff did not meet or equal any of the listings. *Id.*

Dr. Seligman testified that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds; stand and/or walk about 4 hours in an 8-hour workday; sit 6 hours in an 8-hour workday; push/pull limited in the lower extremities to frequent on the right; no communicative limitations; frequently climb ramps or stairs, balance, or stoop; not able to do ladders, ropes and scaffolds, or kneel, crouch, or crawl; no manipulative limitations; no visual limitations; and avoid concentrated exposure to all environmental, except avoid all exposure to heights and hazards such as machinery. Tr. 34. With regard to Plaintiff's migraines, Dr. Seligman found the following limitation to be sufficient: no exposure to lights brighter than office fluorescent lighting. *Id.*, Tr. 61–62.

The ALJ found Dr. Seligman's opinion to be "generally persuasive." Tr. 34. As to supportability, the ALJ reasoned that Dr. Seligman testified he had reviewed the medical evidence and he had more medical evidence available for review than any other professional offering an opinion on Plaintiff's physical functioning. *Id.*

The ALJ also stated that "Dr. Seligman did not offer much specific support from the medical evidence for his opinion within his hearing testimony, though admittedly, he was not explicitly asked to do so." *Id.*

Plaintiff argues that the ALJ's blanket statement that Dr. Seligman reviewed the medical record is insufficient. ECF No. 9 at 14. She asserts the ALJ fails to acknowledge that approximately 500 pages of additional medical records were added to the record since the 2023 hearing, which Dr. Seligman did not review. ECF No. 9 at 14; citing Tr. 2086–2579. Plaintiff contends that the ALJ's failure to properly evaluate the supportability factor constitutes legal error. ECF No. 9 at 14.

The Court agrees with Plaintiff. The ALJ was required to explain how the supportability factor was considered. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). Specifically, the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinions will be. 20 C.F.R. §§ 404.1520c(c)(1)–(2), 416.920c(c)(1)–(2). The ALJ concedes that Dr. Seligman did not offer much specific support from the medical evidence for his opinion, and as Plaintiff indicates, approximately 500 pages of additional medical records were added to the record since the 2023 hearing, which Dr. Seligman did not review. Tr. 34, 2086–2579. Therefore, the Court finds the ALJ's conclusion that Dr. Seligman's opinion was

"generally persuasive" without further explanation, is not supported by substantial evidence. Tr. 34.

As to consistency, the ALJ stated that overall, Dr. Seligman's opinion was "generally consistent with the current file as a whole." Tr. 34. The ALJ determined that in reviewing the full file, the evidence demonstrated that a light exertional limitation was reasonable in accommodating Plaintiff's severe physical impairments relating to degenerative joint disease, inflammatory polyarthritis, degenerative disc disease, POTS, migraines/headaches, and obesity. Tr. 34.

It is the duty of the ALJ to explain their consideration of two factors: supportability and consistency. The supportability factor requires the ALJ to consider whether the medical source presented "more relevant . . . objective medical evidence and supporting explanations." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). Here, other than recognizing that Dr. Seligman testified he reviewed the medical evidence and he had more medical evidence available for review than any other professional offering an opinion on Plaintiff's physical functioning, the ALJ did not explain how she evaluated this factor. While the ALJ made some attempt to address the consistency factor, she did not address the supportability factor in any meaningful way. The ALJ's error in failing to adequately address the supportability factor in finding Dr. Seligman's opinion generally persuasive was not

harmless as the ALJ expressly stated that the physical limitations included within the RFC were largely adopted from Dr. Seligman's opinion. Tr. 35.

*2. Other Medical Opinions*

Plaintiff also argues that the ALJ erred in considering the opinions of Dr. Hansen, Ms. Valtinson, and the prior administrative medical findings. ECF No. 9 at 14–17. In discounting Ms. Valtinson's June 2022 opinion, the ALJ noted that Dr. Seligman did not find Plaintiff to be as limited as Ms. Valtinson's opinion. Tr. 34. Further, in finding the PAMFs somewhat persuasive, the ALJ stated that while they found epilepsy/seizure disorder to be a severe impairment, the ALJ agreed with Dr. Seligman's opinion that the evidence did not support Plaintiff's epilepsy/seizure disorder to be a medically determinable impairment. Tr. 32.

As this case is remanded for errors in evaluating Plaintiff's symptom claims and considering Dr. Seligman's medical opinion, the Court declines to further address this issue. Upon remand the ALJ will reassess all medical opinion evidence with the assistance of medical expert testimony. The ALJ will set forth an analysis of the supportability and consistency of all medical opinions, as required by the regulations. The ALJ is to incorporate the limitations in the opinions into the RFC or give reasons supported by substantial evidence to reject the opinions.

//

//

**C. Remand for Further Proceedings**

Plaintiff urges the Court to remand this case for an immediate award of benefits. ECF No. 9 at 17. "The decision whether to remand a case for additional evidence, or simply to award benefits is within the discretion of the court." *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) (citing *Stone v. Heckler*, 761 F.2d 530, 533 (9th Cir. 1985)). When the Court reverses an ALJ's decision for error, the Court "ordinarily must remand to the agency for further proceedings." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017); *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) ("the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation").

However, in a number of Social Security cases, the Ninth Circuit has "stated or implied that it would be an abuse of discretion for a district court not to remand for an award of benefits" when three conditions are met. *Garrison*, 759 F.3d at 1020 (citations omitted). Under the credit-as-true rule, where (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand, the Court will remand for an award of benefits. *Revels v. Berryhill*, 874 F.3d 648, 668 (9th Cir. 2017). Even where the three prongs have been

satisfied, the Court will not remand for immediate payment of benefits if "the record as a whole creates serious doubt that a claimant is, in fact, disabled." *Garrison*, 759 F.3d at 1021.

"Administrative proceedings are generally useful where the record has not been fully developed, there is a need to resolve conflicts and ambiguities, or the presentation of further evidence may well prove enlightening in light of the passage of time." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101 (9th Cir. 2014) (internal citations and quotations omitted). Here, further proceedings are necessary because there remains conflicting medical opinions as to Plaintiff's functionality. Therefore, remand for further proceedings is appropriate.

Upon remand, the ALJ should further develop the record and issue a new decision. The ALJ should reevaluate Plaintiff's symptom testimony and the medical opinion evidence.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Plaintiff's Opening Brief (ECF No. 9) is **GRANTED**.

2. Defendant's Response Motion (ECF No. 11) is **DENIED**.

3. Pursuant to sentence four of 42 U.S.C. § 405(g), this action is hereby **REVERSED** and **REMANDED** to the Commissioner for further proceedings consistent with this Order.

The District Court Executive is directed to enter this Order, enter judgment for Plaintiff, provide copies to counsel, and **CLOSE** this file.

DATED October 29, 2026.

THOMAS O. RICE
United States District Judge